UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF VIRGINIA
ABINGDON

| UNITED STATES OF AMERICA, | ) | |
|---|---|---|
| | ) | |
| v. | ) | Case No. 1:19-cr-00047 |
| | ) | |
| ASHLEY NICHOLE FIRESTONE | ) | |

**RESPONSE TO DEFENDANT'S MOTION FOR COMPASSIONATE RELEASE**

Defendant Ashley Firestone, who is twenty-eight years old, seeks compassionate release due to her potential exposure to COVID-19 and her desire to care for her family. ECF No. 400. Although Firestone has exhausted her administrative remedies, she has not offered an "extraordinary and compelling reason[]" for her release. Moreover, the sentencing considerations listed in 18 U.S.C. § 3553(a) weigh against her release. Firestone's Motion should be denied.

**I.  BACKGROUND**

**A. Firestone's Criminal Conduct**

In October 2019, a federal grand jury charged Firestone and ten other defendants in a methamphetamine-distribution conspiracy. ECF No. 24. Count One of the Indictment charged Firestone and her codefendants with conspiring to knowingly and intentionally distribute, and possess with the intent to distribute, 500 grams or more of a mixture or substance containing a detectable amount of methamphetamine, in violation of 21 U.S.C. § 841(a)(1). Count Two charged Firestone and a codefendant with possession with the

1

intent to distribute fifty grams or more of a mixture or substance containing a detectable amount of methamphetamine, in violation of 21 U.S.C. § 841(a)(1). Firestone pled guilty to Count One and the lesser included offense of possession with the intent to distribute fifty grams or more of a mixture or substance containing a detectable amount of methamphetamine. ECF No. 311 ¶ 2. The Pre-Sentence Investigation Report ("PSR") included these facts, to which Firestone and the government agreed:

> [F]rom on or about October 15, 2018, through on or about August 16, 2019, in the Western District of Virginia and elsewhere, the defendant did knowingly, intentionally, and unlawfully conspire to distribute, possess with the intent to distribute, and actually distribute 50 grams or more of a mixture and substance containing methamphetamine, its salts, isomers, and salts of its isomers, a Schedule II controlled substance.
>
> The defendant admits that she participated in this conspiracy to distribute controlled substances in Virginia, to include participating in the acquisition of controlled substances with other co-defendants for the purpose of distributing controlled substances and actually distributing controlled substances, both individually and with other co-defendants, throughout the Western District of Virginia.
>
> The defendant admits that she acquired methamphetamine from several co-defendants charged in this conspiracy and other unindicted individuals for the purpose of redistribution in the Western District of Virginia during the time of this conspiracy.
>
> She further admits that upon her arrest on November 14, 2018, in Smyth County, Virginia, a quantity of methamphetamine was seized from her person. At that time, the defendant admitted in an interview with law enforcement that she and another co-defendant had recently distributed approximately two ounces of methamphetamine and that they intended to distribute the remaining methamphetamine seized from them on that date. The defendant also admitted during an interview with law enforcement on the same date her participation in this conspiracy, to include the extent of her distribution activities with other co-defendants and other unindicted individuals involved in this conspiracy. The defendant further admitted that she was awaiting and additional delivery of methamphetamine for distribution purposes.

> The defendant admits she conservatively distributed, possessed with the intent to distribute, and trafficked at least 50 grams but less than 200 grams of a mixture and substance containing methamphetamine, its salts, isomers, and salts of its isomers, a Schedule II controlled substance.

ECF No. 311 ¶¶ 7–12.

Firestone's pre-indictment criminal history was relatively minor, and it resulted in a criminal history category of I. *Id.* ¶ 29–30. Based on a total offense level of nineteen and a criminal history category of I, the Sentencing Guidelines suggested a term of imprisonment from 30 to 37 months. Firestone also faced the five-year minimum term set forth in 21 U.S.C. § 841(b)(1)(B), but the PSR noted that the Court could sentence Firestone below that minimum term in accordance with 18 U.S.C. § 3553(f)(1)–(5). Roughly three months ago, on September 10, 2020, the Court sentenced Firestone to sixty months of imprisonment. Firestone is currently serving her time at FPC Alderson.

### B. Firestone's Request for Compassionate Release.

In her Motion, Firestone says that she is seeking release because she has "2 kids who need [her],"[1] her parents are not "in the best of health," her anxiety and depression are "pretty severe," and she is worried about contracting COVID-19. Aside from her anxiety and depression, Firestone does not claim to have any medical conditions. BOP records indicate that Firestone sought compassionate release from her warden, and the warden denied her request on November 17, 2020.

---

[1] Firestone's Sentencing Memorandum noted that she did "not have physical or legal custody of her children," though she was "making plans . . . to file for and regain physical custody." ECF No. 309 at 2–4.

3

## II. BOP'S RESPONSE TO COVID-19

### A. BOP's Actions to Protect Inmates from COVID-19

In January 2020, BOP began planning for potential coronavirus transmissions. At that time, the agency established a working group to develop policies in consultation with subject matter experts in the CDC, including by reviewing guidance from the World Health Organization. BOP has taken aggressive steps to protect inmates' health and keep COVID-19 outside of its facilities.

In mid-March, BOP implemented an action plan to "mitigate the spread of COVID-19" in prisons, for the protection of both inmates and staff.[2] This Action Plan involved (1) screening of inmates and staff; (2) establishment of quarantine areas within facilities; (3) suspension of social visits and tours; (4) suspension of legal visits; (5) suspension of inmate movements; and (6) modification of operations to maximize social distancing.

On March 31, 2020, BOP announced "Phase Five" of its COVID-19 response "[i]n response to a growing number of quarantine and isolation cases in our facilities."[3] The Phase Five response was extended through Phase Six and Phase Seven plans.[4] BOP

---

[2] BOP, *COVID-19 Action Plan: Agency-Wide Modified Operations* (Mar. 13, 2020), https://www.bop.gov/resources/news/20200313_covid-19.jsp (last visited Dec. 28, 2020).

[3] BOP, *COVID-19 Action Plan: Phase Five*, (Mar. 31, 2020) https://www.bop.gov/resources/news/20200331_covid19_action_plan_5.jsp (last visited Dec. 28, 2020).

[4] BOP, *COVID-19 Action Plan: Phase Six* (Apr. 14, 2020), https://www.bop.gov/resources/news/pdfs/20200414_press_release_action_plan_6.pdf; Fed. Bureau of Prisons, *Action Plan Phase VII* (May 20, 2020),

continued its phased response and has resumed certain normal operations. Additionally, BOP issued cloth face masks to all inmates and staff, common areas are sanitized multiple times a day, and cells can be cleaned at least once a day.[5]

BOP is devoting all available resources to executing the directive from the Attorney General. BOP professionals continue to monitor this situation and adjust practices as necessary to maintain the safety of prison staff and inmates while also fulfilling its mandate of incarcerating all persons sentenced or detained under judicial orders.

Unfortunately, and inevitably, some inmates have become ill, and more inmates likely will become ill in the weeks ahead. But the BOP must consider its concern for the health of its inmates and staff alongside other critical considerations. For example, notwithstanding the current pandemic crisis, the BOP must carry out its mandate to incarcerate sentenced criminals to protect the public. It must consider the effect of a mass release on the safety and health of both the inmate population and the community. And it must consider many other factors, including the availability of both transportation for inmates, at a time that interstate transportation services often used by released inmates are providing reduced service; and supervision of inmates once released, at a time when the U.S. Probation Office has reduced home visits and supervision.

---

https://www.bop.gov/resources/news/20200520_covid-19_phase_seven.jsp (last visited Dec. 28, 2020).

[5] BOP, *Correcting Myths and Misinformation About BOP and COVID-19*, available at https://www.bop.gov/coronavirus/docs/correcting_myths_and_misinformation_bop_covid19.pdf.

### B. BOP's Efforts Relating to Home Confinement

In an effort to relieve the strain on BOP facilities and assist inmates who are most vulnerable to the disease and pose the least threat to the community, BOP is exercising greater authority to designate inmates for home confinement. United States Attorney General William P. Barr directed BOP to prioritize transferring inmates to home confinement in appropriate circumstances when those inmates are vulnerable to COVID-19 under the CDC risk factors—particularly those at institutions where there have been COVID-19 outbreaks.

Attorney General Barr published two memoranda directing the increased use of home confinement for inmates at institutions most affected by the COVID-19 outbreak.[6] First, on March 26, 2020, Attorney General Barr directed BOP to use home confinement, where appropriate, to protect the health and safety of BOP personnel and the people in their custody. Attorney General Barr, however, directed BOP to weigh several factors before determining which inmates would be appropriate for home confinement, including:

- The age and vulnerability of the inmate to COVID-10, in accordance with CDC guidelines;

- The security level of the facility currently holding the inmate, with priority given to inmates residing in low and minimum security facilities;

- The inmate's conduct in prison, with inmates who have engaged in violent or gang-related activity in prison or who have incurred a BOP

---

[6] Mem. from Attorney General to Director of BOP (Mar. 26, 2020), *available at* https://dojnet.doj.gov/usao/eousa/ole/tables/misc/aghome.pdf; Mem. from Attorney General to BOP Dir. (Apr. 3, 2020), *available at* https://dojnet.doj.gov/usao/eousa/ole/tables/misc/agcovid2.pdf.

- violation within the last year not receiving priority treatment under this Memorandum;

- The inmate's score under PATTERN, with inmates who have anything above a minimum score not receiving priority treatment under this Memorandum;

- Whether the inmate has a demonstrated and verifiable re-entry plan that will prevent recidivism and maximize public safety, including verification that the conditions under which the inmate would be confined upon release would present a lower risk of contracting COVID-19 than the inmate would face in his or her BOP facility;

- The inmate's crime of conviction, and assessment of the danger posed by the inmate to the community. Some offenses, such as sex offenses, will render an inmate ineligible for home detention. Other serious offenses should weigh more heavily against consideration for home detention.[7]

The Memorandum further directed that in addition to the above-listed factors,

> before granting any inmate discretionary release, the BOP Medical Director, or someone he designates, will, based on CDC guidance, make an assessment of the inmate's risk factors for severe COVID-19 illness, risks of COVID-10 at the inmate's prison facility, as well as the risks of COVID-19 at the location in which the inmate seeks home confinement.

*Id.* at 2.

On April 3, 2020, Attorney General Barr directed BOP to "give priority in implementing these new standards to the most vulnerable inmates at the most affected facilities," consistent with the remainder of the Attorney General's guidance.[8] He asked BOP

---

[7] Mem. from Attorney General to Director of BOP (Mar. 26, 2020) at 1–2, *available at* https://dojnet.doj.gov/usao/eousa/ole/tables/misc/aghome.pdf.

[8] Mem. from Attorney General to BOP Dir. (Apr. 3, 2020), *available at* https://dojnet.doj.gov/usao/eousa/ole/tables/misc/agcovid2.pdf.

to "immediately review all inmates who have COVID-19 risk factors, as established by the CDC." *Id*.

BOP is devoting all available resources to executing the directive from the Attorney General, stating the "BOP has begun immediately reviewing all inmates who have COVID-19 risk factors, as described by the CDC, to determine which inmates are suitable for home confinement."[9] Since the March 26th memorandum, BOP has placed an additional 8,020 inmates on home confinement.[10] BOP continues to grant reductions in sentences for compassionate release and adjust practices as necessary to maintain the safety of prison staff and inmates while also fulfilling its mandate of incarcerating all persons sentenced or detained under judicial orders.

### C. Firestone Is Not Being Considered for Home Confinement Through BOP's Prioritization Program.

Firestone is not currently identified on her institution's list of inmates eligible for home confinement under BOP's program. BOP will continue to monitor Firestone's risk of exposure to COVID-19 as part of the priority home confinement program. If she cannot obtain home confinement under the BOP's priority program, Firestone is not likely a suitable candidate for compassionate release.

---

[9] BOP, *Update on COVID-19 and Home Confinement*, (Apr. 5, 2020) https://www.bop.gov/resources/news/20200405_covid19_home_confinement.jsp (last visited Dec. 28, 2020).

[10] BOP, *COVID-19 Home Confinement Information*, https://www.bop.gov/coronavirus/ (last visited Dec. 28, 2020).

## III. ARGUMENT

### A. The Government Concedes that Firestone Has Exhausted Her Administrative Remedies.

Section 3582(c)(1)(A) permits the Court to grant a motion for compassionate release, but only if "the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier." 18 U.S.C. § 3582(c)(1)(A). The regulation governing the form of an inmate's request for compassionate release states:

> (a) A request for a motion under 18 U.S.C. 4205(g) or 3582(c)(1)(A) shall be submitted to the Warden. Ordinarily, the request shall be in writing, and submitted by the inmate. An inmate may initiate a request for consideration under 18 U.S.C. 4205(g) or 3582(c)(1)(A) only when there are particularly extraordinary or compelling circumstances which could not reasonably have been foreseen by the court at the time of sentencing. The inmate's request shall at a minimum contain the following information:
>
> > (1) The extraordinary or compelling circumstances that the inmate believes warrant consideration.
> >
> > (2) Proposed release plans, including where the inmate will reside, how the inmate will support himself/herself, and, if the basis for the request involves the inmate's health, information on where the inmate will receive medical treatment, and how the inmate will pay for such treatment.

28 C.F.R. § 571.61(a). Because Firestone asked her warden for compassionate release and the warden denied her request on November 17th, the government concedes that Firestone may seek this relief.

### B. Firestone's Motion Fails on the Merits

#### 1. Firestone has not presented an "extraordinary and compelling" reason.

The compassionate release statute, 18 U.S.C. § 3582(c)(1)(A), as amended by the First Step Act on December 21, 2018, provides that the "court may not modify a term of imprisonment once it has been imposed except that . . . after considering the factors set forth in section 3553(a) to the extent that they are applicable, if it finds that . . . extraordinary and compelling reasons warrant such a reduction . . . and that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission."

In general, the defendant has the burden to show the "rare" and "extraordinary" circumstances meeting the test for compassionate release. *See United States v. Brewington*, No. 2:12-cr-9, 2019 WL 3317972, at *2 (W.D. Va. July 24, 2019) (Jones, J.); *United States v. Willis*, No. 15-cr-3764, 2019 WL 2403192, at *3 (D.N.M. June 7, 2019); *United States v. Gutierrez*, No. CR 05-0217, 2019 WL1472320, at *2 (D.N.M. Apr. 3, 2019). In determining what constitutes "extraordinary and compelling reasons," courts should consider the related policy statements under the United States Sentencing Guidelines. *See, e.g.*, *United States v. Muncy*, No. 1:15-cr-25, 2020 WL 2614614, at *1 (W.D. Va. May 22, 2020); *United States v. Overcash*, 3:15-cr-263, 2019 WL 1472104, at *2 (W.D.N.C. Apr. 3, 2019) (applying what the Sentencing Guidelines defined as "extraordinary and compelling reasons").

Firestone fails to meet her burden. She is only twenty-eight years old, and she points to no medical condition that would put her at an increased risk for severe illness if she contracted the virus that causes COVID-19. Without more, Firestone's concerns about COVID-19 are not "rare" or "extraordinary" circumstances that would merit her release.

Further, the Sentencing Guidelines' policy statement does not identify the need to care for one's parents or children as an extraordinary and compelling reason. Instead, the policy statement recognizes two family circumstances that are extraordinary and compelling: "(i) The death or incapacitation of the caregiver of the defendant's minor child or minor children[, and] (ii) The incapacitation of the defendant's spouse or registered partner when the defendant would be the only available caregiver for the spouse or registered partner." U.S.S.G. § 1B1.13, application note 1(C). Firestone has not claimed that she faces any such circumstance. Moreover, at the time of her sentencing, she did not have custody of her children. *See supra* n.1. This is insufficient to satisfy Firestone's burden of proof. Therefore, Firestone has not presented a basis for compassionate release.

## 2. The § 3553(a) Factors Also Weigh Against a Sentencing Reduction.

Firestone should not be released because the § 3553(a) factors do not support a sentence reduction for compassionate release. Firestone was involved in a significant drug conspiracy, and the Court sentenced her for that conduct little more than three months ago. Releasing her now would not serve the purposes of sentencing. Therefore, the § 3553 factors—including the nature and circumstances of the offense, the need to reflect the seriousness of the offense, promoting respect for the law, and providing just punishment for the offense—weigh against Firestone's release.

In addition, Firestone's release plan is inadequate. Firestone has given no information about how she would travel home, how she would travel to medical appointments, how she would pay for medical appointments, how she would care for herself if she contracted COVID-19, or how she would prevent others from being infected with COVID-19 if she were currently infectious.

In summary, the Court should deny this Motion because Firestone has not provided an extraordinary and compelling reason for her release, and the § 3553(a) factors fail to support any sentence reduction. As such, Firestone cannot carry her "burden of establishing that compassionate release is warranted." *United States v. Vazquez-Ahumada*, No. 5:18-cr-5, 2020 WL 2476160, at *3 (W.D. Va. May 13, 2020) (Dillon, J.).

## CONCLUSION

For these reasons, Firestone's motion should be denied. Should the Court disagree, the government respectfully requests confirmation of an approved home plan and that the Court order any remaining time Firestone would have spent in prison be served as a term of home confinement during her supervised release period. The government also requests the Court order a fourteen-day quarantine at the BOP; a fourteen-day quarantine at home; COVID-19 testing before her release; and the use of masks, gloves, and social distancing during her release, including her transport.

Date: December 28, 2020         Respectfully submitted,

DANIEL P. BUBAR
Acting United States Attorney

*s/ Whitney D. Pierce*
Assistant United States Attorney

U.S. Attorney's Office
180 West Main Street, Suite B19
Abingdon, Virginia 24210
VSB No.:  82520
276-628-4161
276-628-7399 (fax)
USAVAW.ECFAbingdon@usdoj.gov

**CERTIFICATE OF SERVICE**

I hereby certify that on December 28, 2020, I caused the foregoing to be electronically filed with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to counsel for defendant.

*s/ Whitney D. Pierce*
Assistant United States Attorney